1   Raymond E. Brenneman (CA Bar. No. 333699)
    LAW OFFICE OF RAYMOND BRENNEMAN
2   1901 Avenue of the Stars, Suite 200
    Los Angeles, California 90067
3   Phone: (310) 870-8088
    Email:  raymond@brennemanlegal.com
4
    Attorney for Plaintiff
5   *GREGORY ALAN FOSTER*

6
                **UNITED STATES DISTRICT COURT**
7
            **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
8

9
    GREGORY ALAN FOSTER, an Individual;          Case No.: 2:23-cv-9372
10

11                            Plaintiff,         COMPLAINT FOR DAMAGES,
                                                 ACCOUNTING, AND INJUNCTIVE RELIEF
12          vs.
                                                 1.  FEDERAL TRADEMARK
13                                                   INFRINGEMENT [15 U.S.C. §1114]
    PUMA NORTH AMERICA, INC., a Delaware
14  corporation; MB1 ENTERPRISES LLC, a North   2.  TRADEMARK DILUTION [15 U.S.C.
    Carolina limited liability company;             §1125(c); CA. BUS. & PROF. CODE
15  MELO LAFRANCE BALL, an Individual;             §14247]
    BIG BALLER BRAND, INC., a California
16  corporation; LAVAR BALL, an Individual;     3.  COMMON LAW TRADEMARK
    TINA BALL, an Individual; and DOES 1            INFRINGEMENT
17  through 10, inclusive,
                                                 4.  UNFAIR BUSINESS PRACTICES [15
18                                                   U.S.C. §1125(a); CA. BUS. & PROF.
                                                     CODE §17200]
19                            Defendant(s).
                                                 5.  FRAUDULENT REGISTRATION OF
20                                                   TRADEMARK [15 U.S.C. §1120]

21                                               6.  UNFAIR BUSINESS PRACTICES [15
                                                     U.S.C. §1125(a); CA. BUS. & PROF.
22                                                   CODE §17200]

23                                               7.  BREACH OF WRITTEN CONTRACT

24                                               8.  BREACH OF FIDUCIARY DUTY

25                                               9.  CONVERSION

26                                               10. FRAUD

27                                               11. UNJUST ENRICHMENT

28                                               12. CONSTRUCTIVE TRUST


                                                 **JURY TRIAL DEMANDED**

                                    - 1-

1  **COMES NOW**, Plaintiff GREGORY ALAN FOSTER, an individual ("**Alan**"), by and

2  through his attorney, Law Office of Raymond Brenneman, and in complaining against Defendants,

3  PUMA NORTH AMERICA, INC., a Delaware corporation ("**PUMA**"), MB1 ENTERPRISES

4  LLC, a North Carolina limited liability company ("**MB1 Enterprises**"), MELO LAFRANCE

5  BALL, an individual ("**LaMelo**"), BIG BALLER BRAND, INC., a California corporation ("**BBB,**

6  **Inc.**"), LAVAR BALL, an individual ("**LaVar**"), TINA BALL, an individual ("**Tina**"), and DOES

7  1-10, alleges as follows:

8

9  <u>**INTRODUCTION**</u>

10      1.    LaMelo is a professional NBA basketball player.  The claims under this Complaint

11  arise against LaMelo and his company, MB1 Enterprises, due to those defendants' actions in

12  deliberately infringing on the protected intellectual property of Alan.  LaMelo, fresh off his

13  lucrative new endorsement deal with PUMA as the "new face" of that company, knowingly

14  engaged in misappropriation, trademark infringement, trademark dilution, and other related tortious

15  acts against Alan.  Similarly, PUMA, eager to make good on its investment in LaMelo, desired to

16  utilize the trademarks owned by Alan but chose instead to utilize marks that were intentionally

17  designed to be confusingly similar, so as to ride the goodwill coattails of Alan's intellectual

18  property without having to pay for it.

19      2.    Related claims are brought in this Complaint against BBB, Inc., LaVar, and Tina.

20  Alan owns a 33% interest in Ball Sports Group, Inc. and all "Ball Family Companies" including,

21  but not limited to, BBB, Inc. and the assets of the now-dissolved company, Big Baller Brand LLC

22  ("**BBB LLC**").   Alan personally has an ownership interest in all intellectual property previously

23  held by BBB LLC.  Yet, despite Alan's documented ownership rights in these companies and

24  intellectual property, BBB, Inc., LaVar, and Tina have blocked Alan from carrying out his duties as

25  director and member/manager, have prevented him from receiving any profits or proceeds from the

26  businesses, and have even gone so far to steal his intellectual property for their own exclusive use

27  and financial gain.

28  / / /

3. The facts outlined below will show a very coordinated effort on behalf of the Defendants to do one thing—prevent Alan from having any interest in the family companies of the Ball Family and the money they generate. The Ball family members having carried out a very public character assassination campaign against Alan, the facts will show that the Defendants freely raided the companies and intellectual property that belonged to Alan. Evidently, the Defendants surmised that Alan would be too preoccupied fighting other legal battles to notice that they had misappropriated and absconded with his property. Thankfully… he wasn't.

## **PARTIES**

4. Alan is, and at all relevant times has been, an adult individual, residing in the County of Los Angeles, State of California, and conducts business in the County of Los Angeles, State of California. Alan has a 33% ownership interest in Ball Sports Group, Inc. and all "Ball Family Companies" including, but not limited to, BBB, Inc.

5. LaMelo is, and at all relevant times has been, an adult individual, residing in the County of Los Angeles, State of California.

6. PUMA is a Delaware corporation authorized to do business in California with its principal place of business located at 10 Lyberty Way, Westford, MA 01886.

7. MB1 Enterprises is a North Carolina limited liability company with its principal place of business located at 521 E. Morehead Street, Suite 405, Charlotte NC 28202. LaMelo is the president of MB1 Enterprises.

8. BBB, Inc. is a California corporation with its principal place of business located at 4230 E Airport Dr., Unit 110, Ontario, CA 91761.

9. LaVar is, and at all relevant times has been, an adult individual, residing in the County of Los Angeles, State of California.

10. Tina is, and at all relevant times has been, an adult individual, residing in the County of Los Angeles, State of California.

11. The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants herein are designated by fictitious names and Does 1-10, inclusive, are unknown to

Plaintiff.  Plaintiff therefore sues said Defendants by such fictitious names.  When the true names and capacities of said Defendants have been ascertained, Plaintiff will amend this pleading accordingly.

12.     Plaintiff further alleges that Does 1-10, inclusive, sued herein by fictitious names are jointly, severally and concurrently liable and responsible with the named Defendants upon the causes of action hereinafter set forth.

13.     Plaintiff is informed and believes and thereon alleges that al all times mentioned herein Defendants PUMA, LaMelo, and Does 1-10, inclusive, and each of them (collectively, "**Defendants**"), were the agents, servants and employees of every other Defendant and the acts of each Defendant, as alleged herein, were performed within the course and scope of that agency, service or employment.

## JURISDICTION AND VENUE

14.     This action arises under the federal trademark statute (the "**Lanham Act**"), 15 U.S.C. § 1051 *et seq.*, and under the common law of the State of California. This Court has subject matter jurisdiction over the federal trademark, false advertising, and unfair competition claims pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1332, 1338, and 1367. The Court has subject matter jurisdiction over the related California state law claims pursuant to 28 U.S.C. §§ 1338 and 1367.

15.     The amount in controversy between the parties exceeds $75,000.

16.     Plaintiff is informed and believes, and on that basis alleges, that this Court has personal jurisdiction over Defendants because they have extensive contacts with, and conduct business within, the State of California and this judicial district; Defendants have caused LaMelo's signature brand PUMA footwear and apparel products to be advertised, promoted, and sold in this judicial district; the causes of action asserted in this Complaint arise out of Defendants' contacts with this judicial district; and because Defendants have caused tortious injury to Plaintiff in this judicial district.

17.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and (c) because Defendants have extensive contacts with, and conduct business within, the State of California and this judicial district; Defendants have caused LaMelo's signature brand PUMA footwear and apparel products to be advertised, promoted, and sold in this judicial district; the causes of action asserted in this Complaint arise out of Defendants' contacts with this judicial district; and because Defendants have caused tortious injury to Plaintiff in this judicial district.

**FACTUAL BACKGROUND**

**A.      History of Alan and the Ball Family**

18.     Alan met LaVar, his wife, Tina, and their three sons, Lonzo Ball ("**Lonzo**"), LiAngelo Ball ("**LiAngelo**"), and LaMelo Ball ("**LaMelo**"), in or around 2010, when Lonzo was in the 8th grade and Alan's son was in 7th grade. Alan and LaVar's friendship quickly developed. At the time, LaVar worked as a personal trainer and trained Alan's son in his backyard. Alan also developed a close relationship with LaVar's family. Lonzo called Alan "uncle" and Alan referred to Lonzo as "nephew."

19.     By 2015, Lonzo was one of the nation's top-rated high school basketball players, and it was apparent to Alan and LaVar that Lonzo would play professional basketball in the National Basketball Association ("**NBA**"). LaVar mentioned to Alan his intense desire for him and his three sons to become a famous basketball family.

20.     In early 2016, LaVar contacted Alan and asked for his business guidance on how he could monetize his sons' basketball careers and minimize the risk of his three sons being exploited by the sports industry, including sports agencies, retail manufacturers and the media.   Alan expressed that branding the "Ball" name around their "basketball family" was the marketing opportunity of a lifetime and had the potential to yield significant revenue. Alan and LaVar discussed the advantages and disadvantages of the Ball family forming its own sports agency, marketing, and apparel merchandising companies.  LaVar and Tina were immediately interested in building businesses around the "Ball" name.

21.     Because Lavar and Tina were financially unable, Alan expressed that he was willing to provide the funding needed to start these various new businesses. During a meeting in mid-February 2016, Alan, LaVar and Tina agreed that, in exchange for Alan providing loans and business consulting expertise to create, develop, market and manage these new ventures, LaVar and Tina would grant Alan at least a 33% ownership in the new businesses and would ensure that Alan held officer and director positions in these companies.

**B.     Alan's Ownership Interest in Ball Sports Group, Inc. and Big Baller Brand LLC**

22.     On or about April 12, 2016, Alan, LaVar and Tina entered into a written agreement entitled "Proposed Terms-Ball Sports Group, Inc." which set forth the terms governing these new business ventures centered around the Ball family ("**BSG Agreement**"). Pursuant to the BSG Agreement, Ball Sports Group is structured as a global sports management agency that consists of (1) a professional basketball sports agency, (2) a media company, Ball Media and Publishing LLC, (3) a merchandising company, Ball Merchandising LLC, and (4) additional "Ball Family Companies." Pursuant to the BSG Agreement, Alan was entitled to a 33% non-dilutable ownership interest in Ball Sports Group, Inc. Ball Media and Publishing LLC, Ball Merchandising LLC and other 'Ball Family Companies'.

23.     On or about April 20, 2016, Alan filed a Certificate of Name Change to rename an existing Wyoming corporation, Hawk Springs Business Systems, as Ball Sports Group, Inc. ("**BSG**").

24.     On or about April 28, 2016, Alan, LaVar, and Tina executed BSG's written Bylaws ("**BSG Bylaws**"). The BSG Bylaws named LaVar as Director and President, Tina as Director, and Alan as Director, COO, Secretary and Treasurer. On the same day, Alan, LaVar, and Tina executed the Amended Articles of Incorporation of Ball Sports Group, Inc. ("**BSG AAIC**") pursuant to which Ball Sports Group, Inc.'s 1,000,000 shares were divided 335,000 shares each to LaVar and Tina and 330,000 to Alan in order to reflect the terms set forth in the BSG Agreement.

25.     In accordance with the BSG Agreement, Alan, LaVar, and Tina decided to form an apparel, clothing, and footwear merchandising company and selected the name 'Big Baller Brand'

to capitalize on the Ball family brand they wanted to build.  Pursuant to the BSG Agreement, the parties contemplated that each of them would own one-third of Big Baller Brand.  The aim of BBB LLC was to become the first sports apparel and footwear merchandiser to offer co-branding deals to professional athletes in every sport who want ownership of their own brand as opposed to the standard endorsement deals from companies that don't offer such ownership.

26.     On April 26, 2016, Alan filed a Certificate of Name Change with the Wyoming Secretary of State to rename an existing Wyoming limited liability company, NeXt Catch LLC, as Big Baller Brand LLC ("**BBB LLC**") and subsequently filed Amended Articles of Incorporation for BBB LLC.  Pursuant to the BBB LLC Operating Agreement, each of Alan, LaVar, and Tina hold a 33.33% ownership interest in Big Baller Brand LLC.

27.     For a time, a portion of BBB LLC was conveyed to Lonzo in an effort to gain an advantage in the business marketplace, however, on or about December 11, 2017, Alan, LaVar, Tina, and Lonzo agreed that Lonzo would relinquish his entire ownership interest in BBB LLC. On December 11, 2017, Alan, LaVar, Tina, and Lonzo entered into the "Resolution of the Board of Member" ("**Board Resolution**") setting forth Lonzo's assignment of his ownership interest back to BBB LLC, to be redistributed pursuant to the original share distribution of 33.33% to Alan, LaVar and Tina.

28.     On or about December 11, 2017, Alan, LaVar, and Tina, entered into the Second Amended BBB LLC Operating Agreement which sets forth BBB LLC's current ownership, divided equally 33.33% between Alan, LaVar and Tina.

## C.     Alan Develops LaMelo's Brand and Career

29.     LaMelo is the youngest of the Ball brothers. In or about January 2017, LaMelo, LaVar, and Tina agreed that Alan should spearhead BBB LLC's efforts to create a brand for LaMelo as the youngest of the Ball brothers. Alan agreed to create LaMelo his own brand the same way he created a brand for his older brother Lonzo who was drafted second overall in the NBA Draft to the Los Angeles Lakers. Alan created and trademarked Lonzo's brand called 'Zo2' where 'Zo' stands for 'Lonzo' and the number '2' represents the number Lonzo wore on his basketball

1   game jersey.

2       30.     Alan created the name and design for LaMelo's brand called 'MB1' where 'MB'

3   stands for 'Melo Ball' and the number '1' represents the number LaMelo wore on his basketball

4   game jersey. Alan told LaMelo that the MB1 brand would be owned and operated by BBB LLC.

5   LaMelo, LaVar, and Tina agreed to create the MB1 brand under BBB LLC and, through Alan's

6   efforts, BBB LLC registered three 'MB1'-related trademarks under the footwear, apparel and

7   sportswear category with the USPTO.

8       31.     Countless hours went into creating the design, logo, colorways, marketing plan, and

9   global expansion ideas with LaMelo.  Alan made sure to include LaMelo in the process and ensure

10  that LaMelo loved the final product that would become his own signature sneaker line. Early on,

11  Alan counseled LaMelo in developing and protecting his personal brand while capitalizing on his

12  name, image, and likeness.

13      32.     On or about August 22, 2017, BBB LLC released LaMelo's first signature shoe—the

14  MB1.  The MB1 marked a historic feat as the first time any signature shoe had debuted on the feet

15  of a high school prospect.  This groundbreaking move in launching the MB1 --made by Alan on

16  LaMelo's 16th birthday-- not only made LaMelo the youngest athlete in the Ball family and sports

17  history to have a signature sneaker but also substantially enhanced his visibility and individuality

18  within the realm of professional sports.

19      33.     Alan executed a business model that helped launch LaMelo into a basketball

20  marketing prodigy. For example, the debut of LaMelo's MB1 signature sneaker was filmed during

21  the reality show 'Ball in the Family' on FaceBook Watch and published on major sports media

22  outlets.  Alan gave LaMelo a Lamborghini to step out in his camouflage red signature sneaker

23  called the "MB1 Camo" at his sweet sixteen birthday party. LaMelo was pleased with his own MB1

24  signature basketball sneaker by BBB LLC. This birthday event launched the beginning of the MB1

25  global marketing campaign.

26      34.     On or about October 2, 2017, during his junior year of high school, LaMelo was

27  withdrawn from Chino Hills High School to be homeschooled because LaVar had a disagreement

28  with the newly-appointed head basketball coach Dennis Latimore and school administration.

35. LaVar asked Alan to enroll LaMelo in online schooling to make it appear as though he was attending school. In truth, however, LaVar and LaMelo's only focus was basketball and skills training in preparation for LaMelo to play in the NBA. LaMelo made it clear to Alan he did not like school and that his father did not care about education.

36. LaVar tasked Alan to find a team where LaMelo could play basketball since he was no longer enrolled in high school. Alan contacted Harrison Gaines, the in-house sports agent for BSG, to find a professional team for LaMelo to play for in Europe.  Harrison Gaines found a team in Lithuania that was interested in signing LaMelo to a contract.

37. LaMelo played professional basketball in Lithuania for one season while exclusively wearing his MB1 signature sneaker without problem or injury. The time Alan spent with LaMelo in Lithuania and abroad was critical in catapulting Big Baller Brand, in general, and the MB1 brand, in particular, on a global marketing scale with a growing fan base.

38. LaMelo attended all of the BBB LLC pop-up shops to help market and promote his MB1 merchandise and the Big Baller Brand including promotional appearances in Las Vegas, Shanghai, New York City, and London.

39. LaMelo and Alan grew closer as the MB1 brand and Big Baller Brand grew exponentially. Alan mentored LaMelo about business matters including the value of trademark ownership and the importance of protecting your intellectual property and brand.

40. By this time, LaVar and LaMelo had grown to trust and count on Alan for practically every business decision. LaMelo would not be returning to Lithuania for a second season due to a fallout Lavar had with the head coach of the Lithuanian team. LaVar asked Alan to find a new place for LaMelo to play basketball the next season.

41. After a business meeting with "Ice Cube" aka O'shea Jackson at his Santa Monica office, Alan subsequently came up with the name and idea for the Junior Basketball Association League (the "JBA").  The JBA was created to serve as an alternative for high school basketball players who did not want to go to college in order to become a professional player. The JBA was launched with LaMelo as its face and as brand ambassador for the JBA, MB1, and Big Baller Brand. LaMelo played in his MB1 signature sneaker during the entire inaugural season of the JBA.

42.     In exchange for his endorsement and support of the JBA, MB1, and Big Baller Brand, LaMelo was compensated by BBB LLC with a Lamborghini, diamond jewelry, a diamond Rolex watch, and tens of thousands of dollars in cash paid by Alan at the direction of LaVar and Tina.

43.     Despite commercial success in the worldwide marketing of the MB1 brand and Big Baller Brand merchandise, there was a problem with LaMelo's basketball career.  While LaMelo was once a high-ranked player in the NBA mock draft, Lavar's removal of LaMelo from high school resulted in LaMelo's absence from high school rankings as a top recruit, which meant LaMelo would not likely be drafted to the NBA. Alan advised Lavar that LaMelo needed to return to high school immediately in order to get him back on the NBA draft boards.  One requirement, however, of LaVar and LaMelo was that LaMelo shall not be required to do any schoolwork during his high school enrollment so that LaMelo could exclusively devote his time and energy to his pursuit of professional basketball.

44.     LaMelo subsequently attended Spire Academy in Geneva, Ohio.  Spire Academy did not offer classroom instruction but instead allowed student athletes to take online classes or attend their contracted school off campus. LaMelo attended Spire Academy without personally attending any academic classes; instead, fixers were paid to complete schoolwork for LaMelo. LaMelo played basketball at Spire Academy in his MB1 signature sneakers that entire season without any injury or issues. Alan's plan to have LaMelo identified as a top basketball prospect once again worked. LaMelo was back on the NBA draft board and ranked as a top recruit.

45.     Following his high school graduation from Spire Academy, LaMelo played one professional basketball season in Australia. On June 17, 2019, LaMelo signed a two-year contract, including NBA out clauses, with the Illawarra Hawks of the Australian-based National Basketball League (NBL). He joined the Hawks through the NBL Next Stars program, which aims to develop NBA draft prospects.

46.     In the 2020 NBA draft, which was held on November 18, 2020, LaMelo was selected with the third overall pick by the Charlotte Hornets.  LaMelo was voted the NBA Rookie of the Year in 2021 and named as an NBA All-Star the following season in 2022.

47.    The groundwork for LaMelo's commercial success was created by the efforts of Alan and BBB LLC over a two-year period through the global exposure on Facebook's reality show 'Ball in the Family', his professional basketball season in Lithuania, the JBA League inaugural season followed with a JBA/USA European tour broadcasted on Facebook, and his senior year playing at Spire Academy whereby Alan and BBB LLC developed, marketed, and promoted LaMelo via the brands Alan and BBB LLC created and owned--MB1 and Big Baller Brand.

**D.    BBB LLC Holds Valuable Intellectual Property**

48.    On February 13, 2017, BBB LLC filed an application with the USPTO to trademark the standard character mark "Melo Ball1" in connection with footwear which was subsequently registered on May 15, 2018 having US Serial No. 87334180 and US Registration No. 5470715. (A true and correct copy of the TSDR record for the trademark bearing US Registration No. 5470715 is attached hereto as **Exhibit 1** and is incorporated herein by this reference.)

49.    On February 13, 2017, BBB LLC filed an application with the USPTO to trademark the standard character mark "Zo2" in connection with athletic apparel, namely, shirts, pants, jackets, footwear, hats and caps, athletic uniforms which was subsequently registered on October 17, 2017 having US Serial No. 87334183 and US Registration No. 5313742. (A true and correct copy of the TSDR record for the trademark bearing US Registration No. 5313742 is attached hereto as **Exhibit 2** and is incorporated herein by this reference.)

50.    On April 12, 2017, BBB LLC filed an application with the USPTO to trademark the illustration drawing with words, letters, and numbers in stylized form of "ZO" in connection with athletic apparel, namely, shirts, pants, jackets, footwear, hats and caps, athletic uniforms which was subsequently registered on October 17, 2017 having US Serial No. 87409326 and US Registration No. 5313771 (the "**Lonzo Ball Trademark**"). (A true and correct copy of the TSDR record for the trademark bearing US Registration No. 5313771 is attached hereto as **Exhibit 3** and is incorporated herein by this reference.)

51.    On July 31, 2017, BBB LLC filed an application with the USPTO to trademark the illustrated drawing with words, letters, and numbers in stylized form of "BBB Big Baller Brand" in

1  connection with athletic apparel, namely, shirts, pants, jackets, footwear, hats and caps, athletic

2  uniforms which was subsequently registered on September 3, 2019 having US Serial No. 87549391

3  and US Registration No. 5848020 (the "**BBB Trademark**"). (A true and correct copy of the TSDR

4  record for the trademark bearing Registration No. 5848020 is attached hereto as **Exhibit 4** and is

5  incorporated herein by this reference.)

6        52.    On January 12, 2018, BBB LLC filed an application with the USPTO to trademark

7  the standard character mark "Melo Ball 1" which was subsequently registered on August 14, 2018

8  having US Serial No. 87752829 and US Registration No. 5540691 (the "**MeloBall1 Trademark**").

9  (A true and correct copy of the TSDR record for the trademark bearing Registration No. 5540691 is

10  attached hereto as **Exhibit 5** and is incorporated herein by this reference.)

11        53.    On August 11, 2017, BBB LLC filed an application with the USPTO to trademark

12  the illustrated drawing with words, letters, and numbers in stylized form of "MB1" in connection

13  with footwear which was subsequently registered on March 20, 2018 having US Serial No.

14  87565924 and US Registration No. 5430119 (the "**MB1 Trademark**" and, together with the

15  trademarks bearing US Registration Nos. 5470715and 5540691, the "**LaMelo Trademarks**"). (A

16  true and correct copy of the TSDR record for the trademark bearing Registration No. 5430119 is

17  attached hereto as **Exhibit 6** and is incorporated herein by this reference.).

18        54.    Each of the LaMelo Trademarks, Lonzo Ball Trademark, and BBB Trademark are

19  well-known to consumers around the world, are strongly identified with LaMelo, Lonzo, and Big

20  Baller Brand, respectively, and have all been used with huge commercial success by BBB LLC in

21  the marketplace.  For example, the LaMelo Trademarks have been used by BBB LLC to market and

22  sell LaMelo's signature sneakers throughout the world since he was sixteen years old.  The MB1

23  Trademark is so strongly identified with LaMelo that he literally has it tattooed on his leg for the

24  world to see.  Similarly, the Lonzo Ball Trademark was utilized in connection with Lonzo's Big

25  Baller Brand signature sneakers while he played for the Los Angeles Lakers and continues to be

26  utilized by Big Baller Brand, Inc. today in marketing Lonzo's signature shoes.  Likewise, the BBB

27  Trademark is the image that consumers instantly identify with the Ball family brand.  The famous

28  BBB logo has been emblazoned on apparel and merchandise sold around the world and which

continues to be sold by Big Baller Brand today.

55.     Since at least 2017, Alan and BBB LLC have continuously used the highly distinctive LaMelo Trademarks, Lonzo Ball Trademark, and BBB Trademark to market and sell its footwear, clothing and apparel throughout the United States and the world.

56.     Alan and BBB LLC have devoted substantial time, effort, and resources to the development and extensive promotion of the LaMelo Trademarks, Lonzo Ball Trademark, and BBB Trademark and the products offered thereunder. As a result of Alan's efforts, the public has come to recognize and rely upon these marks as an indication of the high quality associated with Big Baller Brand footwear, clothing and apparel products.

57.     The LaMelo Trademarks, Lonzo Ball Trademark, and BBB Trademark registrations are in full force and effect on the USPTO's Principal Register and gives rise to presumptions in favor of Alan and BBB LLC with respect to validity, ownership, and exclusive rights to use the marks throughout the United States.

58.     In addition to its own advertising efforts, BBB LLC has been the subject of many unsolicited stories in national publications and television networks such as the New York Times, the Washington Post, the Los Angeles Times, Fox Sports, ESPN, the Ellen Show, TMZ, and the Jimmy Kimmel Show, highlighting the quality and popularity of Big Baller Brand products.

59.     As a result of BBB LLC's long-term and widespread use of the LaMelo Trademarks, Lonzo Ball Trademark, and BBB Trademark in the United States via Internet, television, radio, and print advertising, and continuous and unsolicited media coverage, these marks enjoy a high degree of consumer recognition and have become famous marks.

60.     Given the fame that both Lonzo Ball and LaMelo Ball have obtained through their NBA careers and the worldwide appeal of Big Baller Brand, gained largely due to Alan's marketing efforts and business acumen, the commercial value of the LaMelo Trademarks, Lonzo Ball Trademark, and BBB Trademark are estimated to far exceed $200 million.

**E.     Big Baller Brand, Inc. Steals Alan's Intellectual Property**

61.     Tension grew between LaVar and Alan over unpaid loans and shareholder

1   distributions owed to Alan. In fact, Alan discovered that LaVar and Tina had improperly taken

2   millions in unilateral distributions from BSG, BBB LLC, and other "Ball Family Companies" in

3   violation of the BSG Agreement.  Rather than make reparations to Alan, LaVar devised a plan to

4   oust Alan from the very companies he helped create, fund, and grow.

5          62.    LaVar conspired with his family members, specifically his wife Tina, his son Lonzo

6   and his youngest son LaMelo, to have Alan removed from BSG, BBB LLC, and other "Ball Family

7   Companies".  LaVar stated to Alan and others how he wanted the Ball Family Companies all to

8   himself and without Alan receiving anything.

9          63.    A new corporation, Big Baller Brand, Inc. ("**BBB Inc.**"), was formed on May 1,

10  2019 by filing Articles of Incorporation of a Close Corporation with the California Secretary of

11  State.  The Articles of Incorporation reflect only a single shareholder and Statement of Information

12  filed December 30, 2021 discloses only a single director.  On information and belief, LaVar Ball is

13  the sole shareholder and director of BBB Inc., either directly or by a beneficial interest.

14         64.    BBB Inc. is not connected to or affiliated with BBB LLC in any way.  BBB Inc. was

15  formed without Alan's knowledge or consent.  Alan has been granted no ownership or interest in

16  BBB Inc. and has not been permitted to be involved in BBB Inc.'s business operations.

17         65.    BBB LLC was administratively dissolved by the Wyoming Secretary of State on

18  January 9th, 2020.  As a result, the intellectual property assets of the dissolved company became the

19  personal property of its members, Alan, LaVar, and Tina.  In the alternative, if the intellectual

20  property of BBB LLC did not become the personal property of its members upon the company's

21  administrative dissolution, then the terms of the BSG Agreement require that the unanimous written

22  approval of the Founders is required to either a) distribute substantially all of BBB LLC's assets or

23  b) transfer any trademark rights.

24         66.    On June 4, 2020, LaVar, without gaining Alan's permission or consent, unilaterally

25  executed an Assignment of Trademark on behalf of BBB LLC which purported to transfer all

26  interests in the BBB Trademark, the MB1 Trademark, and the Lonzo Ball Trademark to BBB, Inc.

27  (A true and correct copy of the Assignment of Trademark is attached hereto as **Exhibit 7** and is

28  incorporated herein by this reference.)  LaVar signed the Assignment of Trademark as President of

BBB LLC when, in fact, he was never designated as such.

67.     Among the many misrepresentations made by LaVar in the Assignment of Trademark are that "Assignor is the owner of the trademark registrations…", "Assignor wishes to assign his rights in the Marks", "Assignor possesses all rights, title, and interest in and to the Marks", "Assignor has the power to enter into this Assignment", and "the rights transferred in this Assignment are free of any lien, encumbrance or adverse claim."

68.     As of June 4, 2020, the BBB Trademark, the MB1 Trademark, and the Lonzo Ball Trademark constituted all, or substantially all, of the assets of BBB LLC.

69.     The malicious intentions are not here difficult to discern—LaVar, Tina, LaMelo, and Lonzo desired to raid the intellectual property of BBB LLC and transfer it to BBB, Inc., a family-owned company in an attempt to deprive Alan of his rightful 33% share of these extremely valuable trademarks so that the huge profits could be claimed entirely by the Ball family alone.

70.     BBB, Inc. has and continues, even now, to reap profits from the sale of apparel and merchandise emblazoned with the trademarked logos and intellectual property it wrongly pilfered from Alan and/or BBB LLC.

**F.     LaMelo and MB1 Enterprises Infringe on Alan's Intellectual Property**

71.     Modern professional athletes often look to monetize their athletic skills not only through lucrative contracts with professional sports teams but also by leveraging their public notoriety and fame into a "brand".  A professional athlete's brand can be monetized through merchandising, endorsement deals, sponsorships, licensing agreements, and co-branding partnerships, just to name a few.  One of the most coveted branding opportunities for a professional basketball athlete is to have their own "signature" shoe.

72.     On information and belief, LaMelo caused MB1 Enterprises to be formed on or about December 18, 2020 by filing Articles of Organization with the North Carolina Secretary of State.  LaMelo is presently listed in public records as President of MB1 Enterprises.  The practical purpose of MB1 Enterprises, on information and belief, is to hold intellectual property related to

1  LaMelo's "brand" thus allowing LaMelo, through MB1 Enterprises, to license his "brand" to

2  companies for profit.

3       73.  On October 5, 2020, MB1 Enterprises filed an application with the USPTO to

4  trademark the illustrated drawing with words, letters, and numbers of "MB1" having US Serial No.

5  90235571. (A true and correct copy of the TSDR record for the trademark bearing US Serial No.

6  90235571 is attached hereto as **Exhibit 8** and is incorporated herein by this reference.)

7       74.  On December 9, 2021, MB1 Enterprises filed an application with the USPTO to

8  trademark the standard character mark "MB.01" having US Serial No. 97164059 and US

9  Registration No. 7063583 (together with the trademark bearing US Serial No. 90235571, the

10  "**Infringing Trademarks**"). (A true and correct copy of the TSDR record for the trademark bearing

11  Registration No. 7063583 is attached hereto as **Exhibit 9** and is incorporated herein by this

12  reference.)

13       75.  The Infringing Trademarks and the LaMelo Trademarks are each filed under the

14  same USPTO goods and services U.S. classes (022 and 039) and cover the same product type—

15  footwear.

16       76.  LaMelo and MB1 Enterprises have attempted to license, make, promote, advertise,

17  market, and sell, in the United States and around the world, footwear and related apparel by

18  utilizing the Infringing Trademarks and/or other marks that are confusingly similar to the LaMelo

19  Trademarks.

20       77.  LaMelo and MB1 Enterprises' infringing products include LaMelo's 'new'

21  "signature" shoe which they refer to as the "MB1", a name that is identical to the LaMelo signature

22  shoe that Alan and BBB LLC earlier created, marketed, sold, and protected via the LaMelo

23  Trademarks.

24       78.  On information and belief, LaMelo and MB1 Enterprises promotes and sells, or

25  causes others to promote or sell, products bearing the Infringing Trademarks and/or other marks that

26  are confusingly similar to the LaMelo Trademarks on a variety of websites and social media sites

27  including Facebook, Instagram, TikTok, and YouTube.

28       79.  LaMelo and MB1 Enterprises products bearing the Infringing Trademarks and/or

1   other marks that are confusingly similar to the LaMelo Trademarks travel in the identical channels

2   of trades and are sold to identical consumers as Alan and BBB LLC's products.

3       80.   LaMelo and MB1 Enterprises' unlawful activities include at least the sale/promotion

4   of footwear that bears the Infringing Trademarks and/or other marks that are confusingly similar to

5   the LaMelo Trademarks, thereby infringing upon Alan's established intellectual property rights.

6       81.   LaMelo and MB1 Enterprises' infringing "MB1" sneakers are not genuine Big Baller

7   Brand products. Alan did not manufacture or inspect the products bearing the Infringing

8   Trademarks and he did not authorize LaMelo or MB1 Enterprises to make, promote, advertise,

9   market, or sell the infringing "MB1" sneakers.

10       82.   LaMelo and MB1 Enterprises' unauthorized use of the LaMelo Trademarks and/or

11   confusingly similar marks in their marketing and advertising materials creates a likelihood of

12   consumer confusion because actual and prospective customers are likely to believe that Alan has

13   approved or licensed LaMelo and MB1 Enterprises' use of its marks, or that Alan is somehow

14   affiliated or connected with LaMelo and MB1 Enterprises or its products or has been authorized by

15   Alan to market and sell such products. In fact, Alan has not sponsored, licensed, or authorized

16   LaMelo and MB1 Enterprises' products.

17       83.   Not surprisingly, these tactics of LaMelo and MB1 Enterprises have led to numerous

18   instances of actual confusion in the consumer marketplace whereby shoes from PUMA are being

19   referred to as the "MB1":

20   / / /

21   / / /

22   / / /

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

**Advertising- PUMA "MB1" shoes:**





COMPLAINT FOR DAMAGES

**Articles- Big Baller Brand MB1 Shoes:**







## This Is The Big Baller Brand MB1, Lamelo Ball's First Signature Shoe

Aug 31, 2017



Past Releases                                             See All

**Articles- PUMA "MB1" Shoes:**





## LaMelo Ball Reveals His PUMA MB1 Signature Sneaker On Foot



84.   Unless stopped, LaMelo and MB1 Enterprises' use of the Infringing Trademarks and/or other marks that are confusingly similar to the LaMelo Trademarks will continue to cause confusion in the marketplace, including but not limited to initial interest confusion, post-sale confusion, and confusion in the secondary sneakers markets.

85.   LaMelo and MB1 Enterprises' actions alleged herein are intended to cause confusion, mistake, or deception as to the source of LaMelo and MB1 Enterprises' products.

86.   By virtue of the acts complained of herein, LaMelo and MB1 Enterprises have created a likelihood of injury to Alan's business reputation and goodwill, caused a likelihood of consumer confusion, mistake, and deception as to the source of origin or relationship of Big Baller Brand's products and LaMelo and MB1 Enterprises' products, and have otherwise competed unfairly by unlawfully trading on and using the LaMelo Trademarks without Alan's permission.

87.   LaMelo and MB1 Enterprises' acts complained of herein are particularly willful and deliberate given the known facts.  LaMelo was instrumental in creating his first signature shoe with Big Baller Brand.  He was fully aware of the existence of the LaMelo Trademarks—he helped

1    design them!  He knew that his Big Baller Brand signature shoe was called the "MB1" and that the

2    name was protected by federal trademark.  Yet, despite his knowledge of all of this, LaMelo

3    willfully and deliberately chose to name the signature shoe he created and designed with PUMA the

4    "MB1" in violation of the LaMelo Trademarks.

5

6    **G.**     **PUMA Infringes on Alan's Intellectual Property**

7         88.    On or about October 14, 2020, LaMelo reportedly signed a lucrative $100 million

8    sponsorship deal with PUMA for signature shoes.  The relationship was synergistic, PUMA sought

9    a "face of the brand" to build a long-term branding strategy around and LaMelo received the

10    backing of a heavy-hitter in the worldwide apparel industry that possessed a more youthful and

11    edgy vibe than other top brands on the market.

12         89.    Leveraging their affiliation with LaMelo, PUMA has manufactured, promoted,

13    advertised, marketed, and sold, in the United States and around the world, footwear and related

14    apparel that utilized the Infringing Trademarks and/or other marks that are confusingly similar to

15    the LaMelo Trademarks.

16         90.    PUMA's infringing products include LaMelo's 'new' "signature" shoe which they

17    refer to as the "MB.01", a name that is, for all intents and purposes, identical to the LaMelo "MB1"

18    signature shoe that Alan and BBB LLC earlier created, marketed, sold, and protected via the

19    LaMelo Trademarks.

20         91.    PUMA promotes and sells products bearing the Infringing Trademarks and/or other

21    marks that are confusingly similar to the LaMelo Trademarks on its own website as well as a variety

22    of social media sites including Facebook, Instagram, TikTok, and YouTube.

23         92.    PUMA's products bearing the Infringing Trademarks and/or other marks that are

24    confusingly similar to the LaMelo Trademarks travel in the identical channels of trades and are sold

25    to identical consumers as Alan and BBB LLC's products.

26         93.    PUMA's unlawful activities include at least the sale/promotion of footwear that

27    bears the LaMelo Trademarks and/or confusingly similar marks, thereby infringing upon Alan's

28    established intellectual property rights.

94.     PUMA's infringing "MB.01" sneakers are not genuine Big Baller Brand products. Alan did not manufacture or inspect the products bearing the Infringing Trademarks and he did not authorize PUMA to make, promote, advertise, market, or sell the infringing "MB.01" sneakers.

95.     PUMA's unauthorized use of the LaMelo Trademarks and/or confusingly similar marks in their marketing and advertising materials creates a likelihood of consumer confusion because actual and prospective customers are likely to believe that Alan has approved or licensed PUMA's use of its marks, or that Alan is somehow affiliated or connected with PUMA's products or has been authorized by Alan to market and sell such products. In fact, Alan has not sponsored, licensed, or authorized PUMA's products.

96.     PUMA's use of the Infringing Trademarks is particularly confusing for consumers since, when pronouncing the name of LaMelo's signature sneaker, the common vernacular dictates that "MB1" and "MB.01" are both simply pronounced as "M-B-1".  Nobody casually pronounces "MB.01" as "M-B-dot-oh-1".  Thus, the LaMelo signature sneakers marketed and sold by PUMA are commonly referred to in the marketplace as "MB1"s.

97.     PUMA desired to name their signature sneaker for LaMelo the "MB1", however, being aware of the LaMelo Trademarks, they attempted to skirt paying Alan for his intellectual property rights by licensing or otherwise agreeing to use MB1 Enterprises' Infringing Trademarks with full knowledge that the consumer marketplace would assimilate "MB.01" as "MB1".

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

98.     The extent of confusion in the marketplace that PUMA has created is best illustrated by PUMA and LaMelo's own promotional video (a screen grab image is seen below) which depicts LaMelo, dressed in PUMA-brand apparel, talking about his new PUMA "MB.01" signature shoes, which are shown in the background.  However, the original MB1 Trademark (owned by Alan) is prominently displayed, tattooed on LaMelo's leg (LaMelo refers to it as "Melo's World") while he is discussing PUMA's "MB.01" shoes.  **And during this video, even LaMelo refers to his PUMA sneakers as "MB1"s!**



99.     While all the instances of actual confusion created by PUMA are impossible to identify, several additional examples of confusion over Big Baller Brand's trademarked "MB1" shoe are mentioned above in paragraph 83.

100.    Unless stopped, PUMA's use of the Infringing Trademarks and/or other marks that are confusingly similar to the LaMelo Trademarks will continue to cause confusion in the marketplace, including but not limited to initial interest confusion, post-sale confusion, and confusion in the secondary sneakers markets.

101.    PUMA's actions alleged herein are intended to cause confusion, mistake, or deception as to the source of PUMA's products.

102.    By virtue of the acts complained of herein, PUMA has created a likelihood of injury to Alan's business reputation and goodwill, caused a likelihood of consumer confusion, mistake, and deception as to the source of origin or relationship of Big Baller Brand's products and PUMA's products, and have otherwise competed unfairly by unlawfully trading on and using the LaMelo Trademarks without Alan's permission.

103.    PUMA's acts complained of herein are willful and deliberate.

**FIRST CAUSE OF ACTION**
**FEDERAL TRADEMARK INFRINGEMENT**
**[15 U.S.C. §1114/ Lanham Act § 43(a)]**
**(By Alan against PUMA, MB1 Enterprises, and LaMelo)**

104.    Alan incorporates and re-alleges by reference to each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

**A. Trademark Infringement by LaMelo and MB 1 Enterprises**

105.    The LaMelo Trademarks are unique and inherently distinctive.   For example, the MB1 Trademark features a fanciful illustrated drawing with words, letters, and numbers in stylized form of "MB1" which is not utilized by any other party in commerce and has no separate significance or meaning apart from the sneakers to which they are affixed.   Additionally, the LaMelo Trademarks are used in connection with Alan and BBB LLC's sale and marketing of not just athletic footwear and apparel, in general, but footwear and apparel specifically associated with LaMelo.   To this point, the MeloBall1 Trademark registered with the USPTO identifies that, "the name(s), portrait(s), and/or signature(s) shown in the mark identifies LaMelo Ball, whose consent(s) to register is made of record."   The specific affiliation of the LaMelo Trademarks with LaMelo

1    makes them unique.

2    106.   In the alternative, the LaMelo Trademarks are descriptive marks that have acquired

3    distinctiveness through repeated use in the marketplace.  The general public has come to recognize

4    and accept the LaMelo Trademarks as a hallmark of the LaMelo signature shoes created and sold by

5    Alan and BBB LLC. The distinctiveness of the LaMelo Trademarks has been established through

6    Big Baller Brand's extensive promotional and advertising efforts over the years, particularly in the

7    context of LaMelo's signature shoe line, which was launched on the occasion of LaMelo's 16th

8    birthday by Alan in 2016; they are instantly recognizable to an appreciable number of local and

9    international consumers alike.

10    107.   The MB1 Trademark was registered on March 20, 2018 while the MeloBall1

11    Trademark was registered on August 14, 2018 with the United States Patent and Trademark Office

12    (USPTO). These LaMelo Trademarks have been utilized in commerce for more than five years, thus

13    they have attained the status of being an incontestable mark, entitling Alan to the fullest of

14    protections under Lanham Act.  Furthermore, the registration certificates issued by the USPTO in

15    connection with these LaMelo Trademarks serves as *prima facie* evidence of their distinctiveness.

16    108.   BBB LLC registered and was the owner of the LaMelo Trademarks. Upon the

17    administrative dissolution of BBB LLC, which occurred by the Wyoming Secretary of State on

18    January 9th, 2020, the intellectual property of BBB LLC became the personal assets of its members

19    whereby Alan, as a member holding a 33% interest in BBB LLC, acquired an interest in the LaMelo

20    Trademarks.

21    109.   LaMelo and MB1 Enterprises' use of the Infringing Trademarks have caused

22    consumer confusion, as outlined above in paragraphs 75-83, whereby the similarity of the Infringing

23    Trademarks to the LaMelo Trademarks, the identical relation and/or proximity of the products being

24    sold, and the similar marketing channels used all contribute to such consumer confusion.

25    110.   LaMelo and MB1 Enterprises, with willful, deliberate, and malicious intent, engaged

26    in the promotion, participation, and advertisement of the Infringing Trademarks to drive sales

27    towards PUMA's footwear and apparel products, with whom LaMelo and MB1 Enterprises had

28    lucrative licensing or endorsement contracts, all for their greedy financial gain.  In carrying out

these deliberate acts, LaMelo was fully aware of the existence of the LaMelo Trademarks—he helped design them!  He knew that his Big Baller Brand signature shoe was called the "MB1" and that name held federal trademark protection.  Yet, despite his knowledge of all of this, LaMelo, either personally or by proxy through MB1 Enterprises, willfully and deliberately chose to name the signature shoe he created and designed with PUMA the "MB1" in violation of the LaMelo Trademarks and either intentionally induced PUMA to infringe on trademark, or continued to supply PUMA permission to use the Infringing Trademarks despite knowing that they infringed on the LaMelo Trademarks.

111.    LaMelo and MB1 Enterprises' acts complained of herein have caused damage to Alan in an amount estimated to be in excess of $200 million, the exact amount of which is to be determined at trial, and such damages will continue to increase unless LaMelo and MB1 Enterprises are permanently enjoined from their wrongful acts.

112.    LaMelo and MB1 Enterprises' acts complained of herein have caused Alan to suffer irreparable injury. Alan will suffer substantial loss of goodwill and reputation unless and until LaMelo and MB1 Enterprises is permanently enjoined from the wrongful acts complained of herein.

**B. Trademark Infringement by PUMA**

113.    The facts pertaining to the distinctiveness, registration, and ownership of the LaMelo Trademarks have already been comprehensively established and discussed above. For efficiency and brevity, they will not be reiterated herein, however, it should be noted that these facts pertain to PUMA as equally as they do to LaMelo and MB1 Enterprises.

114.    PUMA's use of the Infringing Trademarks has caused consumer confusion, as outlined above in paragraphs 90-99.  In short, PUMA's marketing of their LaMelo signature sneakers and apparel utilizing the Infringing Trademarks causes consumer confusion because such products (1) bear marks similar to the LaMelo Trademarks; (2) fall within the same category of goods in the marketplace, are marketed to and consumed by the same consumer population, and are performing the same function; (3) are being marketed in same marketing channels; (4) are intended to cause confusion and a wish to capitalize on the reputation and goodwill of the already well-established LaMelo Trademarks; and (5) are in direct competition with Big Baller Brand's MB1

1    sneakers.

2      115.    PUMA's actions in infringing upon Alan's intellectual property was intentional,

3 deliberate, and malicious. As alleged above, PUMA desired to name their signature sneaker for

4 LaMelo the "MB1", however, being aware of the LaMelo Trademarks, they attempted to skirt

5 paying Alan for his intellectual property by licensing or otherwise agreeing to use MB1 Enterprises'

6 Infringing Trademarks with full knowledge that the consumer marketplace would assimilate

7 "MB.01" as "MB1". These actions of PUMA can only be described as industry bullying, wherein

8 PUMA appears to assert their entitlement to Alan's LaMelo Trademarks without justification,

9 seemingly under the presumption that they can act with impunity. And PUMA continues to exploit

10 Alan's intellectual property to this day, reaping substantial financial gains. Notwithstanding their

11 acute awareness of the misappropriation of the LaMelo Trademarks, PUMA persists in showcasing

12 the Infringing Trademarks on their website and generating revenue on a global scale.

13      116.    As a result of PUMA's trademark infringement, Alan has suffered damages that

14 include, but are not limited to, loss of sales, loss of business reputation, and a decrease in the value

15 of the LaMelo Trademarks. Additionally, PUMA has been unjustly enriched by their infringing

16 activities, and equity demands disgorgement of any profits.

17      117.    PUMA's acts complained of herein have caused damage to Alan in an amount

18 estimated to be in excess of $200 million, the exact amount of which is to be determined at trial, and

19 such damages will continue to increase unless PUMA is permanently enjoined from their wrongful

20 acts.

21      118.    PUMA's acts complained of herein have caused Alan to suffer irreparable injury.

22 Alan will suffer substantial loss of goodwill and reputation unless and until PUMA is permanently

23 enjoined from the wrongful acts complained of herein.

24

25      WHEREFORE, Alan prays for a judgment against PUMA, MB1 Enterprises and LaMelo,

26 and each of them, as outlined below.

27    / / /

28    / / /

**SECOND CAUSE OF ACTION**
**TRADEMARK DILUTION**
**[15 U.S.C. §1125(c); CALIFORNIA BUS. & PROF. CODE §14247]**
**(By Alan against PUMA, MB1 Enterprises, and LaMelo)**

119.    Alan incorporates and re-alleges by reference to each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

**A. LaMelo and MB1 Enterprises' Trademark Dilution**

120.    Big Baller Brand's MB1 shoes are among the most recognizable basketball shoes in the footwear category in both the United States and globally. Among other things, (a) the MB1 name and product are both inherently highly distinctive and have a high degree of acquired distinctiveness; (b) Alan has, through Big Baller Brand, used the LaMelo Trademarks for many years throughout the United States and worldwide in connection with their LaMelo Ball signature shoes; (c) Alan has advertised and publicized the Big Baller Brand MB1 sneakers and the LaMelo Trademarks for a considerable amount of time throughout the United States; (d) Alan has used the LaMelo Trademarks in a trading area of broad geographical scope encompassing all of the states and territories of the United States and globally; (e) the LaMelo Trademarks are an important or predominant trademark in other related channels of sales as it is a signature shoe of LaMelo; (f) the LaMelo Trademarks have a high degree of recognition among consumers both in the United States and internationally; (g) there is no similar trademark in use to any extent or in any nature by third parties; and (h) the LaMelo Trademarks are  currently registered under the Lanham Act on the Principal Register with the USPTO.

121.    The MB1 sneaker was inaugurated on LaMelo's 16th birthday. It was conceived and introduced by Alan, one of the co-founders of BBB LLC, whose ingenuity has consistently propelled the success of various endeavors within the company.

122.    The launch of the Big Baller Brand MB1 sneaker was prominently featured on the reality television series "Ball In The Family," exclusively broadcasted on Facebook Watch. This public unveiling swiftly captivated the audience, resulting in a surge in its popularity. Over the span of more than five years since its launch, Big Baller Brand's MB1 sneaker and the LaMelo Trademarks have continued to become truly prominent and renowned. The LaMelo Trademarks are

widely recognized by the general consuming public of the United States as well as globally as a designation of Big Baller Brand. They have gained national and international popularity through advertisement and publicity of the marks by Alan through BBB LLC and have been registered on the principal register of the USPTO.

123.    LaMelo has, throughout his professional career, during his affiliation with Big Baller Brand, consistently sported his distinctive signature footwear, thereby significantly enhancing the prominence and recognition of the Big Baller Brand MB1 sneaker as he ascended the ranks of professional basketball.

124.    On information and belief, LaMelo is the owner, directly or indirectly, of MB1 Enterprises.  LaMelo is presently listed in public records as President of MB1 Enterprises.

125.    Concerning the Infringing Trademarks, MB1 Enterprises filed an application with the USPTO to trademark the illustrated drawing with words, letters, and numbers of "MB1" (Serial No. 90235571) on October 5, 2020 and filed a subsequent application to trademark the standard character mark "MB.01" (Serial No. 97164059 and Reg. No. 7063583) on December 9, 2021.

126.    LaMelo and MB1 Enterprises are using the Infringing Trademarks in commerce by licensing, making, promoting, advertising, marketing, and selling, in the United States and around the world, footwear and related apparel that utilizes the Infringing Trademarks and/or other marks that are confusingly similar to the LaMelo Trademarks.

127.    On information and belief, LaMelo and MB1 Enterprises promotes and sells, or causes others to promote or sell, products bearing the Infringing Trademarks and/or other marks that are confusingly similar to the LaMelo Trademarks throughout the entire United States and the world via comprehensive advertising campaigns on a variety of print and social media sites including Facebook, Instagram, TikTok, and YouTube.

128.    LaMelo and MB1 Enterprises' use of the Infringing Trademarks began on or about December 6, 2021 with the release of PUMA's signature sneaker for LaMelo.  However, by this time the LaMelo Trademarks had been used by Alan and Big Baller Brand for more than 3 years and had already become famous for the reasons outlined above.

129.    LaMelo and MB1 Enterprises' use of the Infringing Trademarks is likely to cause dilution of the LaMelo Trademarks by blurring or tarnishment.  For example, LaMelo's new "signature" shoe with PUMA, which LaMelo and MB1 Enterprises refer to as the "MB1", utilizes a name that is identical to the LaMelo signature shoe that Alan and Big Baller Brand earlier created, marketed, sold, and protected via the LaMelo Trademarks.  LaMelo and MB1 Enterprises' actions in licensing PUMA to produce the same product (a basketball shoe) with the same name (MB1) affiliated with the same celebrity (LaMelo Ball) erodes the distinctive quality of the LaMelo Trademarks by diminishing their capacity to identify and distinguish Alan and Big Baller Brand's MB1 sneakers from those made by direct competitors such as PUMA.

130.    LaMelo was personally involved with the design of the LaMelo Trademarks, working closely with Alan in their creation. Thus, LaMelo and his company, MB1 Enterprises were wholly aware of Alan and BBB LLC's prior use, ownership, and registration of the LaMelo Trademarks.  LaMelo and MB1 Enterprises' infringement on these marks was a knowing and deliberate attempt to jumpstart their own financial gain by hijacking the substantial goodwill and brand association connected with the LaMelo Trademarks. LaMelo and MB1 Enterprises' licensing of the Infringing Trademarks to PUMA, which are strikingly similar to the LaMelo Trademarks owned by Alan, was intentional and willful.

**B. PUMA'S Trademark Dilution**

131.    The facts pertaining to the distinctiveness and fame of the LaMelo Trademarks have already been comprehensively established and discussed above. For efficiency and brevity, they will not be reiterated herein, however, it should be noted that these facts are also pertinent to PUMA as equally as they are to LaMelo and MB1 Enterprises.

132.    PUMA's use of the Infringing Trademarks began on or about December 6, 2021 with the release of PUMA's "MB.01" signature sneaker for LaMelo.  In promotion of this particular sneaker line, PUMA undertook a comprehensive nationwide marketing campaign.  However, as mentioned above, by this time the LaMelo Trademarks had been used by Alan and Big Baller Brand for more than 3 years and had already become famous.

133.    PUMA's use of the Infringing Trademarks is likely to cause dilution of the LaMelo Trademarks by blurring or tarnishment.  For example, LaMelo's new "signature" shoe with PUMA utilizes a name that is identical to the LaMelo signature shoe that Alan and BBB LLC earlier created, marketed, sold, and protected via the LaMelo Trademarks.  PUMA's marketing and sale of the same product (a basketball shoe) with the same name (MB1) affiliated with the same celebrity (LaMelo Ball) erodes the distinctive quality of Big Baller Brand's MB1 sneakers by diminishing their capacity to identify and distinguish Alan and Big Baller Brand's MB1 sneakers from those made by direct competitors such as PUMA.

134.    PUMA's conduct was designed to erode the distinctive quality of the LaMelo Trademarks by diminishing their capacity to identify and distinguish Big Baller Brand's MB1 signature LaMelo Ball sneakers.  Such conduct of PUMA was knowing, intentional, and deliberate and designed to gain a running start in the sales of it's Lamelo Ball signature shoes by hijacking the existing brand strength and goodwill of Big Baller Brand's MB1 shoes. Given PUMA's prominent stature within the industry, it is reasonable to assume that they possessed knowledge regarding Alan's ownership of the LaMelo Trademarks and the significant reputation and goodwill attached to them. Notwithstanding this awareness, PUMA consciously opted to adopt a mark, MB.01, for their product that bears a nearly identical resemblance to the LaMelo Trademarks owned by Alan. In light of these circumstances, PUMA's behavior can only be characterized as bullying within the competitive landscape.

135.    The above actions by all of the Defendants, namely PUMA, LaMelo, and MB1 Enterprises, have caused and are causing great and irreparable injury to Alan and his intellectual property and to the business and goodwill represented thereby, in an amount that cannot be ascertained at this time and, unless restrained, will cause further irreparable injury, leaving Alan with no adequate remedy at law.

136.    The above-described actions of Defendants do not fall within the purview of (1) fair use of any kind, (2) noncommercial use of the LaMelo Trademarks, or (3) any form of news reporting or news commentary.

1    WHEREFORE, Alan prays for a judgment against PUMA, MB1 Enterprises and LaMelo,

2    and each of them, as outlined below.

3

4                        **THIRD CAUSE OF ACTION**
                 **COMMON LAW TRADEMARK INFRINGEMENT**

5                **(By Alan against PUMA, MB1 Enterprises, and LaMelo)**

6    137.    Alan incorporates and re-alleges by reference to each of the allegations in the

7    preceding paragraphs of this Complaint as though fully set forth here.

8    138.    Alan and BBB LLC have used the LaMelo Trademarks since at least September 5,

9    2017, to identify and distinguish the footwear that it manufactures, sells, and offers for sale in

10   California from those manufactured, sold, and offered for sale by others, by, among other things,

11   prominently displaying the marks on the outside of each shoe. In addition, Alan and BBB LLC have

12   prominently utilized the LaMelo Trademarks in advertisements, in magazine articles, and on social

13   media in California, as well as on displays that are set up wherever the footwear bearing the LaMelo

14   Trademarks are sold or offered for sale.

15   139.    As a result of the sales and advertising by Alan and BBB LLC, the LaMelo

16   Trademarks have developed and now have a secondary and distinctive trademark meaning to

17   potential purchasers in California, in that potential purchasers in California have come to associate

18   footwear bearing the LaMelo Trademarks with Alan and BBB LLC. As a result of this association,

19   PUMA's, MB1 Enterprises', and LaMelo's use of these marks and/or the Infringing Trademarks is

20   likely to cause confusion or mistake or to deceive the public as to the source of origin of the

21   footwear manufactured, sold, or offered for sale by Alan and/or BBB LLC.

22   140.    Without Alan's authorization, in 2020, LaMelo and MB1 Enterprises partnered with

23   PUMA to make an essentially identical "MB.01" sneaker line predicated upon the Infringing

24   Trademarks, whereby LaMelo, MB1 Enterprises, and PUMA knowingly misappropriating the

25   LaMelo Trademarks owned by Alan.  On information and belief, LaMelo and MB1 Enterprises

26   have licensed the Infringing Trademarks to PUMA or otherwise permitted their use for LaMelo's

27   and MB1 Enterprises' financial gain.

28   141.    PUMA manufactures, markets, advertises, and sells the infringing MB.01 sneakers in

California (and, indeed, worldwide) through the same channels and to the same consumers as Alan and BBB LLC's MB1 shoes. PUMA, MB1 Enterprises, and LaMelo 's use of Infringing Trademarks are likely to cause confusion with Alan's LaMelo Trademarks.

142.    Alan conceived the arbitrary, fanciful MB1 Trademark by combining LaMelo's initials and jersey number. The mark has no logical connection to shoes, making it an inherently distinctive source identifier. Both the MB1 and MB.01 shoes are athletic basketball sneakers marketed and sold to the same customer base, and visually the MB1 and MB.01 marks appear nearly indistinguishable on the shoes.  Even the marks are pronounced identically as "Em-Bee-One".  And both marks refer to LaMelo's signature shoe line.

143.    Customers, media, resellers, and even LaMelo himself refer to PUMA's MB.01 shoes as the "MB1s", demonstrating rampant actual confusion.

144.    Defendants have blatantly infringed Alan's common law rights in the LaMelo Trademarks developed through years of continuous and exclusive use. Alan is entitled to damages and injunctive relief against PUMA, MB1 Enterprises, and LaMelo's infringing use of the LaMelo Trademarks.

WHEREFORE, Alan prays for a judgment against PUMA, MB1 Enterprises and LaMelo, and each of them, as outlined below.

**FOURTH CAUSE OF ACTION**
**UNFAIR BUSINESS PRACTICES**
**[15 U.S.C. §1125(a); CA. BUS. & PROF. CODE §17200]**
**(By Alan against PUMA, MB1 Enterprises, and LaMelo)**

145.    Alan incorporates and re-alleges by reference to each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

**A. Unfair Competition- 15 U.S.C. §1125(a)**

146.    PUMA's actions described above and specifically, without limitation, their use of the LaMelo Trademarks, and confusingly similar variations thereof, in commerce to advertise, market, and sell LaMelo signature sneakers throughout the United States and the world, and MB1

1   Enterprises and LaMelo's knowledge, participation, and inducement thereof, constitute unfair

2   competition and false advertising in violation of 15 U.S.C. § 1125(a).

3       147.    Consumers are likely to be misled and deceived by PUMA, MB1 Enterprises, and

4   LaMelo's representations regarding PUMA's and/or BBB's footwear and apparel products.

5       148.    PUMA, MB1 Enterprises, and LaMelo knew or should have known that their

6   statements were false or likely to mislead.

7       149.    As an actual and proximate result of PUMA, MB1 Enterprises, and LaMelo's willful

8   and intentional actions, Alan has suffered damages in an amount to be determined at trial, and

9   unless Defendants are enjoined, Alan will continue to suffer irreparable harm and damage to its

10   business, reputation, and goodwill.

11       150.    Pursuant to 15 U.S.C. § 1117, Alan is entitled to damages for PUMA, MB1

12   Enterprises, and LaMelo's Lanham Act violations, an accounting for profits made by these

13   defendants on sales of footwear and apparel bearing the Infringing Trademarks or other marks

14   confusingly similar to the LaMelo Trademarks, as well as recovery of the costs of this action.

15   Furthermore, Alan is informed and believes, and on that basis alleges, that PUMA, MB1

16   Enterprises, and LaMelo's conduct was undertaken willfully and with the intention of causing

17   confusion, mistake or deception, making this an exceptional case entitling Alan to recover

18   additional damages and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

19   **B. Unfair Competition- California Bus. & Prof. Code §17200**

20       151.    PUMA's actions described above and specifically, without limitation, their use of the

21   LaMelo Trademarks, and confusingly similar variations thereof, in commerce to advertise, market,

22   and sell LaMelo signature sneakers throughout the United States and the State of California, and

23   MB1 Enterprises and LaMelo's knowledge, participation, and inducement thereof, constitute unfair

24   competition and false advertising in violation of the laws of the State of California.

25       152.    By these actions, PUMA, MB1 Enterprises, and LaMelo have engaged in false

26   advertising and unfair competition in violation of the statutory law of the state of California, Cal.

27   Bus. & Prof. Code §§ 17200 and 17500, *et seq.*, and, as a result, Alan has suffered and will continue

28   to suffer damage to its business, reputation, and goodwill.

153.    As a direct and proximate result of PUMA, MB1 Enterprises, and LaMelo's willful and intentional actions, Alan has suffered damages in an amount to be determined at trial and, unless PUMA, MB1 Enterprises, and LaMelo are restrained, Alan will continue to suffer irreparable damage.

WHEREFORE, Alan prays for a judgment against PUMA, MB1 Enterprises and LaMelo, and each of them, as outlined below.

### FIFTH CAUSE OF ACTION
### FRAUDULENT REGISTRATION OF TRADEMARK [15 U.S.C. §1120]
### (By Alan against BBB, Inc. and LaVar)

154.    Alan incorporates and re-alleges by reference to each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

155.    Alan brings forth his Fifth Cause of Action predicated upon liability for fraudulent registration of a trademark under the provisions of the Lanham Act pursuant to 15 U.S.C. §1120, which statute aims to protect the rights and interests of individuals and entities from the deceptive practices of unauthorized and fraudulent trademark registrations.  BBB, Inc. and LaVar deliberately and unlawfully assigned three trademarks in violation of the aforementioned statute.  These trademarks were registered without Alan's required consent or knowledge. Such actions by BBB, Inc. and LaVar not only contravene the federal law but also inflict material damages upon Alan.

156.    On June 4, 2020, LaVar, without Alan's knowledge, permission, or consent, unilaterally executed an Assignment of Trademark (the "**Assignment**") on behalf of BBB LLC which purported to transfer all interests in the BBB Trademark, the MB1 Trademark, and the Lonzo Ball Trademark to BBB, Inc. (See **Exhibit 7**.)  LaVar signed the Assignment as President of BBB LLC when, in fact, he was never designated as such.

157.    LaVar materially misrepresented in the Assignment that "Assignor is the owner of the trademark registrations" when, in fact, the Assignor, BBB LLC had been administratively dissolved five months earlier by the Wyoming Secretary of State on January 9th, 2020 and the intellectual property of BBB LLC, including the marks subject to the Assignment, became the

1    personal property of the members of BBB LLC by operation of law.

2       158.    LaVar materially misrepresented in the Assignment that "Assignor wishes to assign

3    his rights in the Marks" when, in fact, LaVar did not ascertain whether BBB LLC, as Assignor,

4    wished to assign its rights in the three trademarks.  These three trademarks constituted all, or

5    substantially all, of the assets of BBB LLC and their sale/transfer constituted an act outside the

6    ordinary course of the activities of the limited liability company, and the consent of all members,

7    including Alan, to assign the trademarks had not been obtained.

8       159.    LaVar materially misrepresented in the Assignment that "Assignor possesses all

9    rights, title, and interest in and to the Marks" when, in fact, as stated above, the three trademarks

10   had become the personal property of the members of BBB LLC upon its dissolution, resulting in all

11   rights, title, and interests in such trademarks to be vested in the former members and not BBB LLC.

12      160.    LaVar materially misrepresented in the Assignment that "Assignor has the power to

13   enter into this Assignment" when, in fact, BBB LLC had no such power.  Not only did BBB LLC's

14   prior dissolution leave it powerless to enter into the Assignment but BBB LLC failed to obtain the

15   requisite consent of all members prior to disposing of all or substantially all of the company's

16   assets.  Further, BBB LLC was manager-managed by a single manager, Ball Sports Group, Inc.  No

17   action by Ball Sports Group, Inc. authorized the sale of the three trademarks, and no such

18   authorization would exist since the bylaws of Ball Sports Group, Inc. requires the consent of all

19   shareholders, including Alan, prior to the sale of any intellectual property.

20      161.    LaVar materially misrepresented in the Assignment that "the rights transferred in this

21   Assignment are free of any lien, encumbrance or adverse claim" when, in fact, Alan possessed an

22   adverse claim of ownership of the three trademarks.

23      162.    As mentioned above, the Assignment is merely signed by LaVar as "President" of

24   BBB LLC rather than the requisite, proper signature of Ball Sports Group, Inc., as the sole manager

25   of BBB LLC.

26      163.    At the time LaVar made all of the above-mentioned misrepresentations, he was

27   aware that such representations were false and intended that the USPTO would rely on such

28   misrepresentations in accepting the Assignment.  The USPTO did, in fact, rely on BBB, Inc. and

1     LaVar's misrepresentations and accept the fraudulent Assignment.

2          164.    Due to BBB, Inc. and LaVar's unlawful Assignment, Alan has suffered and

3     continues to suffer significant damages, having been deprived of his rightful ownership of the three

4     trademarks and the profits generated by their use in commerce. The continued unauthorized use and

5     registration of the marks by BBB, Inc. and LaVar further deepens these damages and impedes

6     Alan's rightful claims and potential business endeavors associated with the marks.

7          165.    In light of the evidence, Alan fervently asserts that BBB, Inc. and LaVar acted in

8     deliberate contravention of 15 U.S.C. §1120, violating his rights through fraudulent trademark

9     registration. Such actions have not only infringed upon Alan's intellectual property rights but have

10    also caused material harm to his professional reputation and financial well-being. Alan, therefore,

11    implores the Court to recognize the gravity of these defendants' transgressions, to grant appropriate

12    remedies in his favor, and to send a clear message against such egregious misconduct. The

13    vindication of Alan's rights and the preservation of the sanctity of the trademark registration process

14    demand the Court's timely and just intervention.

15

16         WHEREFORE, Alan prays for a judgment against BBB, Inc. and LaVar, and each of them,

17    as outlined below.

18

19                              **SIXTH CAUSE OF ACTION**
                              **UNFAIR BUSINESS PRACTICES**
20              **[15 U.S.C. §1125(a); CA. BUS. & PROF. CODE §17200]**
                         **(By Alan against BBB, Inc. and LaVar)**
21

22         166.    Alan incorporates and re-alleges by reference to each of the allegations in the

23    preceding paragraphs of this Complaint as though fully set forth here.

24         167.    As detailed above, LaVar and BBB, Inc. wrongfully transferred certain intellectual

25    property of Alan, namely the LaMelo Trademarks, the BBB Trademark, and the Lonzo Ball

26    Trademark, without Alan's knowledge or consent.  Being fully aware they had pilfered these

27    trademarks, LaVar and BBB, Inc. then began misappropriating such trademarks by utilizing them in

28    advertising, marketing, and promoting their apparel and products both online and in physical stores

for their exclusive financial gain.

**A. Unfair Competition- 15 U.S.C. §1125(a)**

168.     LaVar and BBB Inc.'s actions described above and specifically, without limitation, their use of the LaMelo Trademarks, the BBB Trademark, and the Lonzo Ball Trademark, in commerce to advertise, market, and sell shoes and apparel throughout the United States and the world constitutes unfair competition and false advertising in violation of 15 U.S.C. § 1125(a).

169.     Consumers are likely to be misled and deceived by LaVar and BBB, Inc.'s representations regarding its footwear and apparel products.

170.     LaVar and BBB, Inc. knew or should have known that their statements were false or likely to mislead.

171.     As an actual and proximate result of LaVar and BBB, Inc.'s willful and intentional actions, Alan has suffered damages in an amount to be determined at trial, and unless LaVar and BBB, Inc. are enjoined, Alan will continue to suffer irreparable harm and damage to his business, reputation, and goodwill.

172.     Pursuant to 15 U.S.C. § 1117, Alan is entitled to damages for LaVar and BBB, Inc.'s Lanham Act violations, an accounting for profits made by these defendants on sales of footwear and apparel bearing the LaMelo Trademarks, the BBB Trademark, and the Lonzo Ball Trademark, as well as recovery of the costs of this action. Furthermore, Alan is informed and believes, and on that basis alleges, that LaVar and BBB, Inc.'s conduct was undertaken willfully and with the intention of causing confusion, mistake or deception, making this an exceptional case entitling Alan to recover additional damages and reasonable attorneys' fees pursuant to 15 U.S.C. § 1117.

**B. Unfair Competition- California Bus. & Prof. Code §17200**

173.     LaVar and BBB, Inc.'s actions described above and specifically, without limitation, their use of the LaMelo Trademarks, the BBB Trademark, and the Lonzo Ball Trademark in commerce to advertise, market, and sell shoes and apparel throughout the United States and the State of California constitutes unfair competition and false advertising in violation of the laws of the State of California.

174.     By these actions, LaVar and BBB, Inc. have engaged in false advertising and unfair competition in violation of the statutory law of the state of California, Cal. Bus. & Prof. Code §§ 17200 and 17500, *et seq.*, and, as a result, Alan has suffered and will continue to suffer damage to his business, reputation, and goodwill.

175.     As a direct and proximate result of LaVar and BBB, Inc.'s willful and intentional actions, Alan has suffered damages in an amount to be determined at trial and, unless LaVar and BBB, Inc. are restrained, Alan will continue to suffer irreparable damage.

WHEREFORE, Alan prays for a judgment against BBB, Inc. and LaVar, and each of them, as outlined below.

**SEVENTH CAUSE OF ACTION**
**BREACH OF WRITTEN CONTRACT**
**(By Alan against LaVar and Tina)**

176.     Alan incorporates and re-alleges by reference to each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

177.     On April 28, 2016, Alan, LaVar, and Tina entered into a valid, enforceable, and binding written contract when they executed the BSG Bylaws, which named LaVar as Director and President, Tina as Director, and Alan as Director, COO, Secretary and Treasurer.

178.     On or about December 11, 2017, Alan, LaVar, and Tina entered into a separate valid, enforceable, and binding written contract when they executed the Second Amended BBB LLC Operating Agreement which sets forth BBB LLC's current ownership, divided equally 33.33% between Alan, LaVar, and Tina.

179.     The BSG Bylaws provide:

"I.10     Founders Agreement Incorporated by Reference.  The officers agree to incorporate by reference all terms proposed in the founders agreement, "Proposed Terms-Ball Sports Group Inc." executed by the Founders on April 12, 2016, included as EXHIBIT 1"

"II.4     Quorum of Directors and Action by the Board.  …Any action required or permitted to be taken by the Board of Directors or any committee thereof may be taken without a meeting if all members of the Board or the committee consent in writing to the adoption of a resolution authorizing the action."

"II.5    Meetings of the Board.   An annual meeting of the Board of Directors shall be held in each year directly after the annual meeting of shareholders. Regular meetings of the Board shall be held at such times as may be fixed by the Board. Special meetings of the Board may be held at any time upon the call of the President or any two directors."

180.    The BSG Agreement, as incorporated into the BSG Bylaws, provides:

"This agreement governs the terms between the Founders, doing business as Ball Sports Group Inc. (the "Company "), and its affiliated Limited Liability Companies "The Ball Companies "."

"The following individuals would be admitted as partners in the Company ("Founders")
Founders 1 – Ball Family and Members
Founders 2 – Alan Foster"

"Each Founder will have a proportional ownership interest in the Company, as follows:
Founders 1 - Shall own a non-dilutable 67% in Ball Sports Group Inc., Ball Media and Publishing LLC, Ball Merchandising LLC and Other "Ball Family Companies" directly related to this agreement.
Founders 2 - Shall own a non -dilutable 33%, in Ball Sports Group Inc., Ball Media and Publishing LLC, Ball Merchandising LLC and Other "Ball Family Companies" directly related to this agreement."

"The Company will be managed by the Founders. and a majority of Founders may take any action on behalf of the Company except where explicitly stated otherwise in this agreement. The unanimous written approval of all Founders is required to:
…liquidate or dissolve the Company, or distribute substantially all of its assets and business;
…enter into any inbound or outbound license, transfer, or other assignment of protectable intellectual property used in the Project, including any patentable inventions, copyrights. trade secrets, or trademark rights (except for inbound end user licenses for software applications in the ordinary course of business);
…approve any contract with a Founder, or an immediate family member or domestic partner of a Founder, or an affiliate of any of the foregoing persons;

"The Founders must refer to the Company, in writing, all opportunities to participate in a business or activity that is directly competitive with the Project within the United States or Canada, whether as an employee, consultant, officer, director, advisor, investor, or partner… Other than pursuant to the preceding paragraph, to protect the Company's legitimate business interests, no Founder may participate in any business or activity that is directly competitive with the Project within United States or Canada, whether as an employee, consultant, officer, director, advisor, owner, sole proprietor, investor, or partner."

"A majority of Founders may not remove a Founder from the Company(s) at any time, for any reason unless consented to by the Founder whose removal is sought."

181.    The Second Amended BBB LLC Operating Agreement provides:

"3.1    PROFITS/LOSSES. For financial accounting and tax purposes the Company's net profits or net losses shall be determined on an annual basis and shall be allocated to the Members in proportion to each Member's relative capital interest in the Company[.]"

"3.2    DISTRIBUTIONS. The Members shall determine and distribute available funds annually or at more frequent intervals as they see fit… Distributions in liquidation of

the Company…shall be made in accordance with the positive capital balances[.]"

182.    Alan performed his obligations under the BSG Bylaws and the Second Amended BBB LLC Operating Agreement by devoting his time, capital, and resources to the growth of BSG and BBB LLC.  For example, Alan managed the day-to-day operations of Big Baller Brand's manufacturing and sales, created a promotional campaign for LaMelo by designing and marketing his own signature sneaker, secured a reality tv series for the Ball family entitled "Ball in the Family" which aired on Facebook Watch, travelled around the world promoting and marketing Big Baller Brand, facilitated meetings and potential collaborations with influential industry figures such as Ice Cube and Kanye West, and promoted the JBA basketball league, which was owned by BSG.

183.    In the alternative, Alan's performance of his obligations under the BSG Bylaws and Second Amended BBB LLC Operating Agreement was excused, waived, or prevented by LaVar and Tina's actions in intentionally and purposefully excluding and preventing Alan from participating in the business operations of BSG and BBB LLC by refusing Alan access to BSG and BBB LLC company records, excluding him from BSG and BBB LLC meetings, and actively preventing him from carrying out his duties as officer and/ or director for both companies.

184.    LaVar and Tina have materially and substantially breached the contract.

185.    Specifically, LaVar and Tina have:

(a)    failed and refused to notice and/or hold regular meetings of the BSG directors or otherwise submit unanimous consent resolutions to the directors for consideration pursuant to the BSG Bylaw requirements but, instead, have unilaterally made Board decisions without notifying or including all board members;

(b)    failed and refused to issue Alan his 33% ownership interest in BBB, Inc. as a related "Ball Family Company" pursuant to the BSG Agreement, choosing instead to retain the entire interest in BBB, Inc. to themselves for their overtly greedy financial gain;

(c)    failed and refused to obtain the unanimous written consent of all BSG founders prior to liquidating or dissolving BBB LLC, or distributing substantially all of its assets and business, as required by the BSG Agreement;

(d) failed and refused to obtain the unanimous written consent of all BSG founders prior to transferring trademark rights of Alan and/or BBB LLC including, but not limited to, the LaMelo Trademarks, the BBB Trademark, and the Lonzo Ball Trademark, as required by the BSG Agreement;

(e) on information and belief, failed and refused to obtain the unanimous written consent of all BSG founders prior to entering into a license, transfer, or other assignment of protectable intellectual property with third parties, as required by the BSG Agreement;

(f) on information and belief, failed and refused to obtain the unanimous written consent of all BSG founders prior to approving any contract with a Founder, or an immediate family member or domestic partner of a Founder, or an affiliate of any of the foregoing persons, including but not limited to LaMelo, MB1 Enterprises, and/or PUMA, as required by the BSG Agreement;

(g) failed and refused to refrain from participating in any business or activity that is directly competitive with BSG or any related "Ball Family Company", as required by the BSG Agreement;

(h) failed and refused to annually allocate profits of BBB LLC to Alan, as required by the Second Amended BBB LLC Operating Agreement;

(i) failed and refused to annually (or more frequently) distribute profits of BBB LLC to Alan, as required by the Second Amended BBB LLC Operating Agreement.

186. As a result of LaVar and Tina's breaches, Alan has suffered general damages of at least $200 million, the exact amount of which will be proven at trial.

187. The general damages flow directly from and are the natural and probable consequences of LaVar and Tina's breaches.

188. As a result of LaVar and Tina's breaches, Alan has sustained special damages of at least $200 million, the exact amount of which will be proven at trial.

189. The special damages suffered by Alan include, but are not necessarily limited to, lost profits, harm to professional reputation, brand dilution, and loss of enterprise opportunity.

190. The special damages were foreseeable and within the contemplation of the parties

before or at the time the contract was made.

191.    Alan is entitled to judgment against LaVar and Tina in the amount of at least $200 million, including interest.

WHEREFORE, Alan prays for a judgment against LaVar and Tina, and each of them, as outlined below.

**EIGHTH CAUSE OF ACTION**
**BREACH OF FIDUCIARY DUTY**
**(By Alan against LaVar and Tina)**

192.    Alan incorporates and re-alleges by reference to each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

193.    At all relevant times, LaVar and Tina had a fiduciary relationship with Alan.  LaVar and Tina's positions both as directors and majority shareholders in BSG and as members and majority owners of BBB LLC imposed a fiduciary relationship upon them as a matter of law respecting Alan, who was a minority shareholder and owner of BSG and BBB LLC, respectively.

194.    LaVar and Tina owed Alan the fiduciary duties of good faith, loyalty, fair dealing, and due care. LaVar and Tina owed these duties to Alan pursuant not only to the fiduciary nature of the parties' relationship but also pursuant to common law, Cal. Corp. Code § 309, and Cal. Corp. Code § 17704.09, among others.

195.    LaVar and Tina breached these duties to Alan by engaging in self-interested transactions, failing to disclose critical information, and stealing funds.  Specifically, LaVar and Tina have: (a) covertly formed BBB, Inc., which is subject to the BSG Agreement without notifying Alan or issuing him his requisite ownership interest in the company or paying him his percentage of profits; (b) misappropriated the LaMelo Trademarks, the BBB Trademark, the Lonzo Ball Trademark and other intellectual property from Alan and BBB LLC for their exclusive personal financial gain; (c) transferred ownership of the LaMelo Trademarks, the BBB Trademark, the Lonzo Ball Trademark and other intellectual property without notifying or disclosing such transfer to Alan; (d) on information and belief, entered into contracts or agreements pertaining to the

1  LaMelo Trademarks, the BBB Trademark, the Lonzo Ball Trademark and other intellectual
2  property for their exclusive personal financial gain and without notifying or disclosing such actions
3  to Alan; and (e) on information and belief, secreting away revenue and proceeds of BSG, BBB, Inc.,
4  BBB LLC and/or other Ball Family Companies for their exclusive personal financial gain and to
5  deprive Alan of profits that are rightly due to him.

6  196.  As a direct and proximate result of LaVar and Tina's breach of these duties owed to
7  Alan, Alan has suffered damages stemming from profits that were wrongly withheld, deprivation of
8  valuable intellectual property, and deprivation of valuable stock, membership interests, and other
9  personal property, the value of which is estimated to be in excess of $200 million, the exact amount
10 of which is to be determined at trial, which have accrued and are continuing to accrue.

11 197.  Additionally, Alan is entitled to punitive damages as a result of LaVar and Tina's
12 conduct. Specifically, in doing the acts alleged above, LaVar and Tina have been guilty of
13 oppression, fraud and malice and have acted in conscious disregard of Alan's rights, entitling Alan
14 to recover punitive and exemplary damages in an amount to be established at trial.

15

16 WHEREFORE, Alan prays for a judgment against LaVar and Tina, and each of them, as
17 outlined below.

18

19 **NINETH CAUSE OF ACTION**
**CONVERSION**
20 **(By Alan against LaVar, PUMA, LaMelo, and MB1 Enterprises)**

21 198.  Alan incorporates and re-alleges by reference to each of the allegations in the
22 preceding paragraphs of this Complaint as though fully set forth here.

23 199.  As discussed above, Alan, pursuant to the BSG Bylaws, owns a 33% ownership
24 stake in BSG and all Ball Family Companies including, but not limited to, BBB, Inc.  Furthermore,
25 Alan was a 33% owner of BBB LLC prior to its dissolution and now personally owns intellectual
26 property formerly held by the company including, but not limited to, the LaMelo Trademarks, the
27 BBB Trademark, and the Lonzo Ball Trademark.

28 / / /

**A. Conversion by LaVar**

200.    Tension arose between LaVar and Alan over unpaid loans and shareholder distributions owed to Alan. Alan approached LaVar about getting repaid on various outstanding loans Alan made to LaVar and also suggested that BBB LLC and BSG make distributions to their members and shareholders, respectively.  In typical LaVar fashion, he became irate and barked back that Alan should stay in his lane and that LaVar would determine when loans would be paid back and company funds would be paid out!

201.    In fact, Alan discovered that LaVar had improperly and secretly taken millions in unilateral distributions from BSG, BBB LLC, and other "Ball Family Companies" in violation of the BSG Bylaws and BSG Agreement.

202.    Rather than pay Alan the funds owed to him, LaVar, who stated to Alan and others how he wanted the Ball Family Companies all to himself and without Alan receiving anything, devised a plan to oust Alan from BSG, BBB LLC, and other "Ball Family Companies" by exercising dominion and control over all incidents of ownership of the stock or membership interest that Alan held in such companies.

203.    In a separate incident discussed previously, LaVar assigned the BBB Trademark, the MB1 Trademark, and the Lonzo Ball Trademark to BBB, Inc. despite the fact that Lavar knew that these three trademarks were the personal property of Alan.

204.    Alan did not consent to any of LaVar's actions.  Despite proper and timely demand by Alan, LaVar has refused to return the stock of BSG and the related companies or the BBB Trademark, the MB1 Trademark, or the Lonzo Ball Trademark and continues to exercise dominion and control over such property.

205.    As a direct and proximate result of LaVar's conversion, Alan has suffered damages including loss of income and profits from sales, reputational damage, and diminution in value of his property rights in an amount exceeding the jurisdictional minimum of this Court.

206.    Alan has been damaged by LaVar's conversion of the stock of BSG and the related companies and the BBB Trademark, the MB1 Trademark, or the Lonzo Ball Trademark in an amount in excess of $200 million dollars, the exact amount of which is to be determined at trial.

207.    LaVar willfully and in bad-faith converted Alan's property.

**B. Conversion by PUMA, LaMelo, and MB1 Enterprises**

208.    Alan is the owner and has the right to possess the LaMelo Trademarks.

209.    By virtue of their actions as detailed hereinabove, PUMA, LaMelo, and MB1 Enterprises substantially interfered with Alan's property by knowingly or intentionally assuming control or ownership over the LaMelo Trademarks or otherwise applying them to their own use.

210.    Alan did not consent to any of PUMA, LaMelo, or MB1 Enterprises' actions. Despite proper and timely demand by Alan, PUMA, LaMelo and MB1 Enterprises have refused to cease knowingly or intentionally assuming control or ownership over the LaMelo Trademarks or otherwise applying them to their own use.

211.    As a direct and proximate result of PUMA, LaMelo, and MB1 Enterprises' conversion, Alan has suffered damages including loss of income and profits from sales, reputational damage, and diminution in value of his property rights in an amount exceeding the jurisdictional minimum of this Court.

212.    Alan has been damaged by PUMA, LaMelo, and MB1 Enterprises' actions in an amount in excess of $200 million dollars, the exact amount of which is to be determined at trial.

213.    PUMA, LaMelo, and MB 1 Enterprises willfully and in bad-faith converted Alan's property.

214.    Alan is entitled to preliminary and permanent injunctive relief against PUMA and LaMelo, as well as compensatory, punitive, and exemplary damages in an amount to be proven at trial.

WHEREFORE, Alan prays for a judgment against LaVar, PUMA, MB1 Enterprises, and LaMelo, and each of them, as outlined below.

/ / /

/ / /

/ / /

/ / /

**TENTH CAUSE OF ACTION**
**FRAUD AND CONCEALMENT OF FACTS**
**(By Alan against PUMA, LaMelo, and MB1 Enterprises)**

215.    Alan incorporates and re-alleges by reference to each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

216.    PUMA, LaMelo, and MB1 Enterprises misrepresented facts pertaining to certain intellectual property, namely, the LaMelo Trademarks and the Infringing Trademarks. Specifically, PUMA, LaMelo, and MB1 Enterprises represented that the Infringing Trademarks were unique, original, and associated with LaMelo's first signature sneaker.

217.    PUMA, LaMelo, and MB1 Enterprises made these representations in connection with the marketing and sale of PUMA's LaMelo signature sneaker.

218.    PUMA, LaMelo, and MB1 Enterprises' representations were materially false and misleading because the Infringing Trademarks were not unique or original and were not associated with LaMelo's first signature sneaker.  Instead, the Infringing Trademarks were virtual copies of the LaMelo Trademarks, designed to fool the consuming public and mooch off the goodwill and brand recognition built by Alan and BBB LLC when they created, marketed, and sold LaMelo's true first signature sneaker- the Big Baller Brand MB1.

219.    Alan is informed and believes and on that basis alleges that PUMA, LaMelo, and MB1 Enterprises knew or had reason to know these representations were false when they made them because PUMA, LaMelo, and MB1 Enterprises were then presently aware of the LaMelo Trademarks and the pertinent details concerning the BBB MB1 shoes.  LaMelo, for instance, personally designed the LaMelo Trademarks and worked side-by-side with Alan in their creation. Similarly, PUMA, as a commercial giant in the athletic shoe industry, was alert to the trademarks and intellectual property owned by BBB LLC in connection with its apparel.

220.    Alan is informed and believes and on that basis alleges that PUMA, LaMelo, and MB1 Enterprises deliberately misrepresented facts pertaining to the LaMelo Trademarks and Infringing Trademarks to Alan so as to induce him to refrain from taking action to protect his intellectual property and to prevent Alan from becoming aware of the fact that PUMA, LaMelo, and MB1 Enterprises were using his intellectual property without compensating him.

221. Alan relied to his detriment on PUMA, LaMelo, and MB1 Enterprises' misrepresentations by refraining from taking any action to protect his intellectual property.

222. Alan's reliance on PUMA, LaMelo, and MB1 Enterprises' misrepresentations was justifiable in that PUMA, LaMelo, and MB1 Enterprises concealed the falsity of the representations by failing to inform Alan of their intention to market and sell LaMelo signature shoes and apparel with marks that are confusingly similar to Alan's LaMelo Trademarks in an effort to increase sales and brand awareness by piggybacking off the goodwill created by years of Alan's hard work.

223. PUMA, LaMelo, and MB1 Enterprises' intentional misrepresentations, inducing Alan's reliance thereon, was the direct and proximate cause of Alan's loss, which he would not have sustained but for PUMA, LaMelo, and MB1 Enterprises' fraud.

224. As a result of PUMA, LaMelo, and MB1 Enterprises' fraud, Alan is entitled to an award of damages in an amount to be proved at trial.

225. Additionally, Alan is entitled to punitive damages as a result of PUMA, LaMelo, and MB1 Enterprises' fraudulent conduct. Specifically, PUMA, LaMelo, and MB1 Enterprises' wanton and malicious actions were carried out with the specific intent and purpose to deprive Alan of his intellectual property rights and to subvert and avoid the requirement to pay royalties and license fees that PUMA, LaMelo, and MB1 Enterprises knew would be due Alan for use of such intellectual property.

WHEREFORE, Alan prays for a judgment against PUMA, LaMelo, and MB1 Enterprises, and each of them, as outlined below.

### ELEVENTH CAUSE OF ACTION
### UNJUST ENRICHMENT
**(By Alan against All Defendants)**

226. Alan incorporates and re-alleges by reference to each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

227. By virtue of their egregious and illegal actions as detailed hereinabove, including the willful theft, replication, and commercial exploitation of Alan's intellectual property, and the

subsequent sale and marketing of infringing products, all Defendants have been unjustly enriched in an amount to be proven at trial.

228.    As a result of Defendant's unjust enrichment, Alan has suffered substantial financial losses and damages.

229.    Alan seeks equitable relief, in accordance with the principles of unjust enrichment, to redress the harm suffered as a consequence of Defendants' wrongful actions, and to ensure that Defendants are appropriately held accountable for their ill-gotten gains.

WHEREFORE, Alan prays for a judgment against all Defendants, and each of them, as outlined below.

### TWELFTH CAUSE OF ACTION
### CONSTRUCTIVE TRUST
**(By Alan against All Defendants)**

230.    Alan incorporates and re-alleges by reference to each of the allegations in the preceding paragraphs of this Complaint as though fully set forth here.

231.    The proceeds from the sale of footwear and apparel bearing the LaMelo Trademarks, the Infringing Trademarks, the BBB Trademark, or the Lonzo Ball Trademark were acquired by Defendants through fraud or other wrongful acts.  In addition, Defendants received and continue to receive and presently retain assets including, but not limited to, money and intellectual property including, but not limited to, the LaMelo Trademarks, the Infringing Trademarks, the BBB Trademark, or the Lonzo Ball Trademark, which were improperly obtained and/or fraudulently conveyed.

232.    Alan requests that the Court order either a constructive trust be and remain imposed on those assets which were improperly and fraudulently transferred or obtained as described above, or in the alternative, that a preliminary and permanent injunction issue enjoining Defendants, or any of them, from transferring, hypothecating, or spending any of the assets or property in their possession, under their control or in their name(s). In any event, Alan requests that the Court order Defendants, and each of them, to account for all sums taken, hypothecated, spent, or transferred in

1  connection with the LaMelo Trademarks, the Infringing Trademarks, the BBB Trademark, or the
2  Lonzo Ball Trademark.

3

4       WHEREFORE, Alan prays for a judgment against all Defendants, and each of them, as
5  outlined below.

6

7                          **<u>PRAYER FOR RELIEF</u>**

8       **WHEREFORE**, Plaintiff GREGORY ALAN FOSTER prays for judgment against
9  Defendants PUMA NORTH AMERICA, INC., MB ENTERPRISES LLC, MELO LAFRANCE
10  BALL, BIG BALLER BRAND, INC., LAVAR BALL, TINA BALL and DOES 1-10, and each of
11  them, as follows:

12       1.   For damages in an amount to be proven at trial for trademark infringement under 15
13  U.S.C. §1114/Lanham Act §43(a);

14       2.   For damages in an amount to be proven at trial for trademark dilution under 15
15  U.S.C. §1125(c) and Ca. Bus. & Prof. Code §14247

16       3.   For damages in an amount to be proven at trial for trademark infringement under
17  California common law;

18       4.   For damages in an amount to be proven at trial for unfair business practices under 15
19  U.S.C. §1125(a) and Ca. Bus. & Prof. Code §17200;

20       5.   For disgorgement of Defendants' profits under U.S.C. §1117;

21       6.   For damages in an amount to be proven at trial for fraudulent registration of a
22  trademark under 15 U.S.C. §1120;

23       7.   For general and special damages according to proof;

24       8.   For compensatory and statutory damages according to proof;

25       9.   For an injunction by this Court:

26       a.   prohibiting Defendants from engaging or continuing to engage in unlawful,
27            unfair, or fraudulent business acts or practices described herein;

28

     b.  enjoining Defendants, their agents, employees, and all those acting in concert or participation with them, from manufacturing, distributing, advertising, or otherwise using the trademarks of Plaintiff or any trademark that is substantially similar to Plaintiff's trademarks;

     c.  requiring the destruction of all goods, packaging, promotional materials, and any other items bearing any infringing trademarks;

     d.  requiring Defendants to undertake corrective advertising to dispel the consumer confusion they have caused, including a public acknowledgement of Plaintiff's exclusive rights to the LaMelo Trademarks, the BBB Trademark, and the Lonzo Ball Trademark; and

     e.  requiring a public apology by PUMA, MB1 Enterprises, LaMelo, LaVar, and BBB, Inc. for their willful and intentional trademark theft.

10.  For an order from the Court requiring that Defendants provide complete accountings and for equitable relief, including that Defendants disgorge and return or pay their ill-gotten gains obtained from the illegal transactions entered into and or pay restitution, including the amount of monies that should have been paid if Defendants complied with their legal obligations, or as equity requires;

11.  For an order of the Court that an asset freeze or constructive trust be imposed over all monies and profits in Defendants' possession which rightfully belong to Plaintiff;

12.  For treble damages suffered by Plaintiff as a result of the willful and intentional infringements engaged in by Defendants, pursuant to 15 U.S.C. §1117(b);

13.  For damages in an amount to be proven at trial for unjust enrichment;

14.  For an award of punitive damages in an amount to be determined by the Court according to proof.

15.  For an award for Plaintiff's reasonable attorneys' fees;

16.  For an award of all costs of suit;

/ / /

/ / /

17.  For an award of pre- and post-judgment interest as allowed by law; and

18.  For such additional legal or equitable relief this Court may deem just and proper.

DATED: November 6th, 2023

**LAW OFFICE OF RAYMOND BRENNEMAN**

By: *Raymond Brenneman*

      Raymond E. Brenneman, Esq.
      *Attorney for Plaintiff*